# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### April 20, 2010 Session

## MARYAM GHORASHI-BAJESTANI v. MASOUD BAJESTANI

**Appeal from the Chancery Court for Hamilton County**
**No. 08-0098     Howell N. Peoples, Chancellor**

**No. E2009-01585-COA-R3-CV - Filed August 24, 2010**

After seven years of marriage, Maryam Ghorashi-Bajestani ("Wife") sued Masoud Bajestani ("Husband") for divorce. After a trial, the Trial Court entered its order, *inter alia*, awarding Wife a divorce, dividing the marital property, setting Husband's child support obligation, awarding Wife transitional alimony for nine years, awarding Wife alimony in futuro to begin after the termination of the transitional alimony, and awarding Wife attorney's fees. Husband appeals to this Court raising issues regarding the classification and distribution of marital property and the awards of alimony, among others. Wife raises issues regarding child support, and also requests that this Court take notice of a post-judicial fact, and award her attorney's fees on appeal. We modify as to the award of transitional alimony, vacate the award of alimony in futuro, affirm as to the child support and division of property, decline to award attorney's fees on appeal, and decline to take notice of the post-judicial fact.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Modified, in part; Vacated, in part; Affirmed, in part; Case Remanded**

D. MICHAEL SWINEY, J., delivered the opinion of the Court, in which HERSCHEL P. FRANKS, P.J., and JOHN W. MCCLARTY, J., joined.

John R. Meldorf, Hixson, Tennessee, for the appellant, Masoud Bajestani.

Selma Cash Paty, Chattanooga, Tennessee, for the appellee, Maryam Ghorashi-Bajestani.

# OPINION

## Background

Wife and Husband were married in July of 2000, first in an Islamic ceremony, and then again in a ceremony at the courthouse in Chattanooga, Tennessee. Two minor children were born of the marriage. Husband has adult children from a previous marriage. In February of 2008, Wife sued Husband for divorce.

Wife testified at trial that she was born on March 23, 1968 in Iran. Wife has dual citizenship in the United States and Iran. Wife holds an engineering degree that she obtained in Florida. Wife stated: "That was my dream always to move to United States and become an engineer. I couldn't compete or pass the exams in Iran as a female in that field." Wife speaks Persian, English, and German, and stated that she did not think anyone had a hard time understanding her. Wife admitted she is in good health and has no physical problems.

Wife stopped working outside the home in July of 2001 when she gave birth to the parties' first child. Wife's last job outside the home was at Alstom Power in Chattanooga where she worked as a mechanical engineer and earned $43,000 per year. Wife worked at Alstom Power for seven or eight months. When the parties married, Wife had a student loan of $21,000. Wife paid off this loan with money she earned while working at Alstom Power during the marriage. The parties' second child was born in August of 2003.

When asked if she planned to return to working outside the home, Wife stated:

I feel that I have a job, that is taking care of my kids, already. This is the most important job I've ever had, and my kids are very small. And if I want to go back to work force, I need some special education, I need refresh courses and I need to get back to that standard that - - to apply for a job. It's been eight years I haven't worked. There's so many things I've forgotten.

But the most important thing that I don't want to forget is that my kids are most important and the money that I might be able to make outside - - and my kids don't have an uncle, cousin, grandparents, so I really think that I need to stay with my kids.

Wife testified that her expenses per month were $14,567. Wife also calculated what her expenses would be if she obtained a job outside the home making $43,000 to

$45,000 per year. She testified that if she obtained such a job, her expenses would be $17,000 per month due to:

> Additional expenses, the cost of the clothing, car maintenance, laundry, all those things that - - the kids will have to stay at school longer hours, it's going to add to that, their food, the grocery, the lunch outside, all of these, the gas, is going to add up.

When asked if there would be a benefit to her obtaining a job outside the home, Wife stated: "No, not at all. Actually, it's better if I don't let a stranger raise my kids rather than me stay home and be with my kids." When asked if she was aware of jobs in the community that pay between $70,000 and $80,000 that she could apply for, Wife stated: "My kids need me more." Wife admitted that the school her children attend has an after-school program that runs until 6 p.m., which her children could attend. She also admitted that there is a pre-care program at the school, and the children could be delivered to the school before 8 a.m.

Wife testified that during the marriage, the family would take two or three trips per year and further stated: "we have an overseas, once-a-year overseas trip with the kids, and the other trips would be to New York City visiting relatives, Virginia." When asked where she shops for herself and the children, Wife stated: "We go to New York to shop or Atlanta, or on our trips, if we went to London, we do those kind of shopping, going around on tours, we went to Alaska." Since filing for divorce, Wife has traveled to New York, Alaska, and Washington, D.C.

Husband was 53 years old at the time of trial. He testified that he is an Iranian citizen, and that he also has been a United States citizen since 1982. Husband has lived in the United States since 1975. Husband has three grown children from a previous marriage. Husband owns the home the parties lived in during the marriage and testified that he was awarded this home in his prior divorce. The parties are debt-free except for the mortgage on the home.

Husband works for TVA. Husband described his job stating: "I'm the vice president for Watts Bar Unit 2 project. It's a new nuclear plant that's being built and this is going to be the first new plant after 20 years that is going to come online in the United States." Husband holds a bachelor's degree in electrical engineering and a master's degree. Husband signed a contract for his current job in October of 2007. He stated: "The contract is for five years and one year after the plant comes online. So it's for a total of six years. The contract that is written, it actually says that when the plant comes online and runs for some period of time reliably and safely, then there are some incentives. So if you add everything, it's a six-year contract, essentially." Per the contract, Husband had four years left

to complete the job as of the time of trial. Husband has no future contracts.

In 2005 Husband moved to Huntsville, Alabama for his job. Wife and the children remained in Tennessee. When asked why she remained in Tennessee, Wife stated:

Because the kids were going already to school here. They had already started to school. They were in the middle of the year, of their school year. And [Husband] told me that project is going to be done, finished earlier than two years. He's trying to push the process to be done in earlier than two years.

When questioned further, Wife admitted that at that time the parties' older child was attending pre-school, and the younger child was only three years old. Husband testified that because he was "assigned to a city outside my central station…," TVA provided Husband with housing and paid his expenses during the time he worked in Alabama. Husband lived in Huntsville, Alabama for eighteen or nineteen months and saw Wife and children on weekends.

At trial, Husband stated: "I'm willing to pay for my children's education, private school, and other expenses that comes with other education like piano lesson, other than just tuition for the school." He further stated that he anticipates helping his children with college.

The parties were married in 2000 and that year Husband had taxable income of approx $300,000. In 2001, Husband had taxable income of approximately $236,000. Wife's W2 form for 2001 shows wages of approximately $24,000 for the approximately seven months that she worked outside the home during that year. In 2002, Husband's income was approximately $115,000. Husband's income for 2003 was approximately $155,000. In 2004, Husband had income of approximately $119,00. Husband's income for 2005 was approximately $300,000. In 2006, Husband had income of approximately $594,00. Husband testified that his base salary in 2006 was approximately $240,000, and that the remaining amount consisted of bonuses. Husband's wages including bonuses for 2007 were approximately $599,000. However, in 2007 Husband declared approximately $2,293,000 in taxable income because Husband withdrew $1.5 million out of his TVA deferred compensation account in 2007.

Husband has a contract for deferred compensation for Watts Bar Unit 2. He stated: "Deferred compensation, this is a contract that was put in place, essentially what they call it is the golden handcuff, to essentially to get you to stay for the duration of the whole project. But you have to meet certain requirements to be able to get the money that's in this contract…. Specifically, budget, schedule, that if you miss - - and the safe and reliable

operation of the unit after it comes online. And if you miss any of this, essentially, you won't get this deferred compensation."

Husband testified: "That bonus is based on performance of the project, performance of the certain milestones that you are to meet, budget, schedule and TVA's overall performance." Husband testified that for 2008, "TVA overall performance has not been good because of various issues that we have had this year, drought. The performance of the fossil units and nuclear units hasn't been good, so we missed a lot of milestones."

With regard to the $1.5 withdrawal from his deferred compensation account, Husband stated:

> The reason I withdrew that money was because this money, the deferred compensation money is actually in the market, you know, invested in the market. So I looked at the market and the market wasn't going to go anywhere; actually it was losing its value, the dollar was losing its value, and I had this opportunity that I discussed with [Wife] to invest some money outside the U.S. and specifically buy some property back in Tehran, Iran. So I decided to withdraw that money and invest it outside the U.S.

Husband stated that he and Wife were planning on sending a little over $1 million for this purpose and that to date he has sent $600,000. Husband testified that the money he sent to Iran has not been invested in anything because he did not fulfill his commitment to send the full amount. Husband claims he can get the money back with some loss of percentage due to conversion. He testified that the money is not in a bank, but instead is in his brother-in-law's possession.

Husband withdrew the $1.5 million by claiming financial hardship and an immediate and heavy need for housing. At trial, Husband admitted that he did not have a financial hardship at the time he made the withdrawal. He further admitted that he was not taking the money for housing but for an investment. Husband had to pay taxes on the withdrawal such that the net amount that Husband received was $975,000.

Husband sent the money "to a bank in Canada and from Canada to Tehran," Iran via two transfers. Husband testified that at the time he made the first transfer he did not think he had received the divorce papers. Husband testified that when he went to Wife's attorney's office to pick up the divorce papers, no one told him about the restraining order, and that he "actually never read the whole paper" because he was upset.

In addition to the $1.5 million withdrawal, Husband made other withdrawals

from his deferred compensation account during the marriage. Exhibits introduced at trial show withdrawals of approximately $37,000, $194,000, and $85,000, among others. Husband testified that he loaned money to his sister and her husband. A copy of a check introduced at trial shows that Husband wrote a check to his sister in 2003 for $40,000. Husband stated that his sister paid him back approximately $6,500, and that Husband does not expect her and her husband to pay back the remainder of the loaned monies. Husband also testified that he has been paying some of his sick parent's expenses. Husband stated: "I've been supporting my parents for the last 20-some years …." In October Husband sent his parents $10,000, which he testified was to pay for their hospital bills. Husband testified that he would estimate that he has sent his parents approximately $8,000 to $10,000 per year. Husband also has paid $1,000 per month plus all expenses for his children from his previous marriage. Husband later testified that he had sent $3,000 to his daughter from his previous marriage and, when questioned further, stated that his earlier answer of $1,000 referred to the alimony he paid to his previous wife.

Husband claimed that CD accounts in both the parties' names were actually his separate property. He testified:

Before I got married I had two CD accounts: one was with AmSouth, and the other one was SunTrust Bank. And over the years it went from one CD account to another. When it matured, I put them in another account. And all the money that we didn't spend from year to year I added to those, to different CD accounts. And all the CD accounts, they were all in my name until last year when she specifically asked me that she wants to be added to - - her name to be added to the CD accounts. So we both went to Regions Bank and I added her name to my CD accounts.

Husband asserted that at the time the parties married, one of his CD accounts was worth approximately $58,000, and the other approximately $40,000.

Husband testified that he and Wife talked about the possibility of her returning to work. He stated that he told Wife that there were different companies paying people with Wife's experience and level of education between $70,000 and $80,000. Husband testified that Wife's "engineering degree and experience that she has when she worked at Alstom, that's adequate to get a decent job."

After trial, the Trial Court entered its detailed order on April 16, 2009 finding and holding, *inter alia*:

K. The Court finds that [Wife] has grounds for divorce and should be granted

-6-

a divorce on the grounds of Inappropriate Marital conduct.

* * *

C. The Court finds that the [Husband's] home, located at 619 Grand Mountain Drive, Chattanooga, TN is his premarital property as defined by T.C.A. § 36-4-121(a)(1)(B); the liability for the mortgage at SunTrust Bank is solely [Husband's]. However, the home has increased $50,000 in value during the marriage. In addition, the mortgage has been reduced from $177,000 to $88,000 during the marriage which results in an additional increase of $89,000 in equity paid with income received during the marriage.

The Court further finds that throughout the marriage, [Husband] never transferred title to the property to [Wife], nor increased the debt on the property to the financial detriment of [Wife]. Neither did he ever treat the property as marital property. Transmutation occurs when previously separate property is treated in such [a] way as to give evidence of an intention that it become marital property. This can occur if property is purchased with separate funds but then titled to both parties to the marriage, or it can occur by deeding separate property into the names of both parties with the intent to make a gift of the property to the marital estate. *McClellan v. McClellan*, 874 S.W.2d 350 (Tn. App. [sic] 1993).

[Husband's] premarital home was thus never transmuted into marital property and remains the sole and exclusive property of [Husband].

D. The Court finds that the parties' agreed division of non-vehicular personal property results in [Wife] receiving assets valued at $14,750 and [Husband] assets valued at receiving $9,060. Ex. 51 and 40.

E. The court further finds that the parties' agreed division of vehicles results in [Wife] receiving $18,000 and [Husband] receiving $15,800. Ex. 68, p.1.

F. The Court finds that $94,186 of [Husband's] 401(k) is a premarital asset. Ex. 65 and 27. The current value of said 401(k) is $251,012. Ex. 74. Thus, $156,826 of the increase of the 401(k) is a marital asset.

G. The Court finds that the TVA Pension is not able to be calculated under the rules of said Plan. Therefore, the portion acquired during marriage shall be calculated as a fraction, the numerator of which shall be 8.25, being the

number of years of marriage between these parties, and the denominator shall be the total years in which [Husband] shall have been a member of said Plan, from the date of his initial membership until the date he retires from TVA. Ex. 5.

H. The Court finds that the Regions Bank CD is a marital asset. In 2006, [Husband] specifically put his wife's name on the Certificate of Deposit. Transmutation is brought about "by placing separate property in the name of both spouses." *Batson v Batson*, 769 S.W.2d 849, 858 (Tenn. Ct. App. 1988). The current value of said CD is $1,050,000. Ex. 68.

I. [Husband] claims as his separate property on "Exhibit 58" $250,000 in deferred compensation with TVA. The Court finds that as of October 2000 [Husband] did have $247,258 in his deferred compensation plan (Exhibit 75). However, the court finds that [Husband] has withdrawn from his deferred compensation account $37,083 October 2, 2000, $194,221 on August 2007 and $85,000 September 23, 2005 (Exhibit 9, 10, 31, 90). Having withdrawn from his deferred compensation plan more money than he had in the fund when the parties married, the Court finds that there is no longer any separate money in his deferred compensation plan. [Husband] also paid alimony and child support to his first wife and family, gave $40,000 to his sister, and gave thousands of dollars to his parents in Iran during the marriage. The current value of [Husband's] TVA Deferred Compensation Plan is $2,730,141. The Court further finds that the afore-stated value is the remainder after the [$1,500,000] withdrawn therefrom by [Husband] on December 24, 2007. Ex. 13.

> 1. Before [Husband] withdrew $1.5 million from his deferred compensation account, he had over four million dollars in deferred compensation (Exhibit 25). He deposited the $975,000 he received from the withdrawal after taxes were withheld in the joint CD account (Ex. 23) To withdraw the 1.5 million, [Husband] falsely certified that he was making a "hardship withdrawal" for "housing" (Exhibit 30). He admits he knew his application was the same as a sworn affidavit and that the statements that the financial hardship is "my immediate and heavy financial need" and that the stated purpose of the withdrawal for "housing" were not true. Because of the embargo on doing business with Iran, from the $975,000 deposited in the joint CD account, [Husband] transferred

$600,000 to a bank in Canada to be transferred to his brother-in-law in Iran to be invested (Ex. 29). He testified he did not know where the money was, if it was drawing interest or whose name it is deposited in but he could get it back.

2. The remainder was placed in the Regions Bank CD where it remains.

J. Although [Husband] claims the $300,000 he transferred to Iran on the day he was served with this divorce and $300,000 he transferred February 14, 2008, three days after the divorce complaint was filed are his separate funds, the Court finds this money was earned during the marriage and is marital property. [Husband] claims that he did not read the injunction against transferring and disposing of funds before he made the transfers. The Court finds that these transfers were made after [Husband] knew or should have known that he was enjoined from withdrawing these funds from the joint CD account. The Court finds it makes no difference whether [Husband] knew or did not know about the injunction, the money was admittedly withdrawn from the joint CD account and is a marital asset to be divided with his wife. Wife testified she was against this investment because of the political situation between Iran and the United States.

K. The following assets are found to be [Husband's] separate assets: $94,185 in [Husband's] 401(k) Plan in July 2000 (Ex. 26); $119,214 in his TVA Retirement Annuity; that part of his TVA pension earned prior to the marriage and the part earned following the dissolution of this marriage; a boat; two refrigerators; a washer; a dryer; a stereo; a camera; and two Persian rugs.

L. The following assets are found to be [Wife's] separate property: all her jewelry; fifty percent interest in house in Iran given by her parents; furniture she owned prior to the marriage.

* * *

In dividing the assets, the Court considered the fact that [Husband] owned the residence prior to the marriage and that during the marriage about $89,000 in equity resulted from the payments of principal, interest and insurance from money earned during the marriage. *Brock v. Brock*, 941 S.W.2d 896, 901, [sic] (Tenn. Ct. App. 1996).

There is no question that by the wrongful withdrawing of $1.5 million deferred compensation in 2007 and incurring tax liability of $525,000 withheld by TVA (Ex. 13) and an additional $51,000 tax, a total of $576,000, [Husband] dissipated $576,000 of the marital estate. [Husband] did not need the money. If he had not withdrawn it, it could have been distributed to Wife at a much lower tax rate.

When [Husband] married [Wife], he had $72,579.57 in AmSouth checking, $103,694.87 in AmSouth CD's and $38,000 in SunTrust CD[']s, a total of $214,229.44. (Exhibit 58 of [Husband's] responses to Interrogatories dated May 21, 2008 with his list of Assets and Liabilities). He claims the amount of these accounts should be set aside to him as his separate property. Both parties testified that after they married, [Husband] put his wife on his bank accounts. He referred to the Regions Bank account as "our" account and stated "we" put everything in one account. In 2006, he specifically put his wife's name on the certificate of deposit account in which there was $1,713,827 on January 31, 2008 (Ex. 39, 69).

[Husband] admits that he paid alimony and child support after their marriage to his first wife and family (Exhibit 93). He sent thousands of dollars to his parents in Iran during this marriage. He gave or loaned $40,000 to his sister, Sepideh Maghandam. He cannot identify any account in which the money he had when he married is now located.

Transmutation is brought about "by placing separate property in the name of both spouses." *Batson v. Batson*, 769, [sic] S.W.2d 849, 858 (Tenn. Ct. App. 1988).

During the marriage, when parties treat their separate property in such a way as to show their intent that it become marital property, transmutation occurs.

Although [Husband] claims the $300,000 he transferred to Iran on the day he was served with this divorce and $300,000 he transferred February 14, 2008, three days after the divorce complaint was filed are his separate funds, the Court finds this money was earned during the marriage and is marital property.

* * *

A. [Husband] is employed by the Tennessee Valley Authority. His present contract is for the position of Vice President of Watts Bar Nuclear Plant, Unit 2. Ex. 4 and 33. Said contract expires in 2012, but because of possible performance bonuses, benefits may be paid through 2013. [Husband] has no contract of employment beyond 2012 with TVA or any other employer. [Husband] has testified that he reasonably believes his employment under the contract will actually be completed during 2011.

B. [Husband's] present income, including bonuses, is $619,000 a year. (Ex. 72).

C. [Husband] has received all deferred compensation disbursements to which he is entitled under his previous contacts for Browns Ferry Nuclear Plant. The final such disbursement was received on July 23, 2008, Ex. 11.

D. [Husband] is presently under contract to receive deferred compensation, based upon his completion of the contract and his attainment of certain performance goals. However, the deferred compensation can only be received if he remains a TVA employee during the term of said contract and completes said entire contract.

> 1. The amount of said deferred compensation which he receives varies depending upon his attainment of certain goals.
>
> 2. As with his deferred compensation under his Browns Ferry Contract, said deferred compensation from Watts Bar will be paid into a deferred compensation account and not directly to [Husband]. Because the deferred compensation is contingent, the Court did not include it in the child support calculation.

E. Further, said deferred compensation is paid to [Husband], if earned, only at certain times and any withdrawal of said funds by him from said deferred compensation account is a taxable event to him at the time they are withdrawn.

F. [Husband's] one-time withdrawal on December 24, 2007, Ex. 13, of $1,500,000 ($985,000, after taxes) from a deferred compensation plan established by his employer did not represent earnings for purposes of calculating child support; said withdrawal was an asset transfer for the purposes of purchasing and developing a piece of real property in Iran.

G. [Husband's] earnings during the marriage were $293,437.58 in 2000; $212,532 plus $6,212 in interest in 2001; $115,786 plus $562 interest in 2002; $155,196 plus $155 interest in 2003; $119,657 plus $7 interest in 2004; $300,841 plus $199 interest in 2005 (all from testimony of [Husband]); $594,344 plus $870 interest in 2006 (Ex. 15), and $619,885.54 plus $14,895 interest in 2007 (Ex. 14).

H. [Wife] is a licensed civil engineer with a baccalaureate degree.

I. [Wife] speaks three languages, has no physical or mental limitations, and is capable of working.

J. [Wife's] last salary was $44,000 a year in 2001 from Alstom Power.

     1.  This was her first job as a civil engineer after obtaining her degree.

     2. [Wife] worked for approximately 7 months, until near the birth of the parties' first child.

     3.  In 2001, [Wife] retained all of her earnings, $24,286.47 rather than contributing them to the family income; she used her earnings to pay her pre-marital debt for her college education with the agreement of [Husband].

K. [Wife] is capable of earning between $72,000 and $80,000 a year in the Chattanooga area.

L. There are positions paying these starting salaries in the Chattanooga area; such positions have been available for the last few years and would not be under the supervision or control of [Husband.]

M. [Wife] has refused to return to work or seek work during the pendency of this divorce.  However, she is aware that there are positions available for her to work in the field in which she is trained.

* * *

O. Pursuant to the Tennessee Administrative Regulations § 1240-2-4, the Child Support Regulations, [Wife] is inferred to have income of $72,000 a

year and the Court determines [Husband] has income of $619,000 a year.

\* \* \*

a. Pursuant to § 1240-2-4-.07(g), the maximum child support obligations payable by [Husband] to [Wife] is presently $3,200 a month.

b. [Husband] has already agreed in open Court to continue to pay the children's private school tuition, books, and fees, (including the expected increases therein thru 12th grade) and their summer activity fees. These amounts, for 2007, amounted to $25,599.96, which for child support calculation purposes is converted to $2,133.33/month.

(1) The Court adopts and approves this agreement as a part of his additional child support obligation.

c. The Final Child Support Order, or FCSO, (Ex. 86, line 16) and the pro-rata monthly cost of private school and summer activities, is $5,333.33 a month[.]

d. Because the FCSO and the private school and summer activity expenses exceeds the amount of [Husband's] duty under the Adjusted Support Obligations, or ASO by over $900 a month, [Husband] shall have no other duty of financial support for his children.

e. Under the present child support laws, [Husband] is not responsible for his children's education or care beyond the 12th grade, unless said child were to become an adult disabled child. T.C.A. § 36-5-101.

f. Further, based on [Husband's] treatment of children of his first marriage, the Court does not find [Husband] to be a risk of flight or abandonment and therefore, there is no reason to require [Husband] to establish and fund an education trust for his children.

Thus, the Court finds the testimony of Dr. Bruce Hutchinson of

-13-

no benefit in determining [Husband's] future child support obligations.

* * *

Taking into consideration the factors set out in T.C.A. 36-5-101(d) the Court has determined that [Wife] is economically disadvantaged relative to [Husband] and should be awarded alimony. The Court finds that even though Wife has the education and training as an engineer, it is unlikely that she would ever be rehabilitated to an earning capacity approaching that of [Husband].

The parties shared a comfortable living standard that exceeded the average and Husband was still able to put aside large sums of money. Wife was able to go to New York, Atlanta and London for shopping trips. Husband took trips to Iran and sometimes traveled with Wife. Husband purchased, as gifts for Wife, expensive jewelry.

The Court finds both parties contributed to this marriage. [Husband] by his financial contribution. There is no question that his stressful job caused him to spend many hours and often days away from his family and to have a strained, detached relationship with [Wife] when he was home. [Wife] willingly took over almost all of the child care, household upkeep and homemaker duties.

Need and the ability to pay are the critical factors in setting the amount of an alimony award. *Smith v. Smith*, 912 S.W.2d 155, 159 (Tenn. App. 1995); *Lancaster v. Lancaster*, 671 S.W.2d at 503. *Isbell v. Isbell*, 816 S.W.2d 735, [sic] (Tenn. 1991).

[Wife] filed two expense sheets: one as if she were working with expenses of $17,261 (Ex. 18) and the other based on her providing full time child care with expenses of $14,567 (Ex. 17). She explained the reason for the difference between $11,160 a month in expense statements she filed in May 2008 was because that expense statement was for her temporary expenses while the case was pending and [Husband] was paying for health insurance and other insurance and expenses that she did not consider.

She explained the $1600 for mortgage on her Exhibits 17 and 18 was to cover insurance and taxes. She hoped she would receive a sufficient amount

-14-

of liquid assets so she could pay a substantial amount of cash for a residence and have no mortgage or a very small mortgage. The Court finds these explanations credible.

[Husband] says the entire family lived on $10,000 a month. However, he spent two years living in Huntsville and now lives in Spring City and receives various reimbursements and benefits from TVA. He testified TVA paid for all of his housing expenses when he is living away from Chattanooga because Chattanooga was his home base.

Furthermore, based on his representation that his net pay was $21,498.97 a month, his net income for 2008 through October was $214,989.70. In addition to that, he drew an additional $144,000 (net on his $188,000 bonus), a total of $358,989.70 net after taxes and other deductions, such as health insurance.

[Husband] started paying spousal support June 1, 2008. In July 2008, he drew $144,000 net on his $188,000 compensation bonus. In the five months between June 1 and November 5, he had total income of $251,490. He paid his wife and for his children, $32,500 (6,500 a month). [Husband] by his representations should have had $218,990 disposable income after paying spousal and child support.

The Court finds [Wife's] testimony about their usual standard of living is more credible than [Husband's]. The Court finds her request for $14,567 is reasonable. Since the Court found that [Husband] should pay $3,200 for child support and the costs of private school tuitions, [Wife's] need is reduced to $5,734. However, [Wife] did not consider the fact that she would have to pay income tax on the amount awarded to her as alimony. Husband will be able to deduct the alimony. Considering a minimum of 15% income tax Wife will have to pay, the Court finds that [Wife] needs and [Husband] can afford to pay $6,600 a month as transitional spousal support for a period of six years; reducing to $4,500 per month for three years and then $2,500 per month as periodic alimony.

Further, as part of her transition, [Wife] shall be entitled to remain in the house at 619 Grand Mountain Drive up to ninety (90) days following the payment to her of the lump sum specified by the Court as her share of the marital property. During this period, [Husband] shall pay the mortgage, insurance and taxes on the home.

\* \* \*

Wife has requested that the fees she incurred in this divorce be adjudged against [Husband]. The Court finds said request is reasonable and should be granted.

In adjudging the fees against Husband as additional alimony, the Court has considered the disparity in the earning capacities of the parties; the issues raised by Husband regarding the Islamic marital certificate being a prenuptial agreement, and his alleged premarital assets which no longer existed; and his transfer of assets after service of the statutory injunction. The attorney's fees and costs resulted from [Wife] being forced to defend against these claims to protect her future and the support and education of their children.

\* \* \*

6. [Husband] shall pay to [Wife] $6,600 a month as transitional spousal support for a period of six years; then, reducing to $4,500 per month for three years and then $2,500 per month as periodic alimony. The payment of transitional spousal support to [Wife] is non-modifiable and shall not terminate on the remarriage of [Wife], but shall terminate on the death of either party. The periodic alimony shall terminate on the death of either party and the remarriage of [Wife], whichever occurs first.

Husband filed a motion to alter or amend or for a new trial, which the Trial Court granted in part and denied in part finding and holding, *inter alia*, that if transfer of any portion of Husband's TVA Deferred Compensation Plan results in a taxable event, each party will be responsible for one-half of said taxes. Husband appeals to this Court.

## Discussion

Although not stated exactly as such, Husband raises seven issues on appeal: 1) whether the Trial Court erred in holding that certain of Husband's pre-marital assets had been transmuted, and that certain of Husband's pre-marital assets had been co-mingled with marital assets; 2) whether the Trial Court erred in dividing the portion of Husband's deferred compensation not accessible to Husband until certain contractual dates and conditions have been met; 3) whether the Trial Court erred in awarding transitional alimony to Wife, and in setting the amount; 4) whether the Trial Court erred in awarding alimony in futuro to Wife, and in setting the amount; 5) whether the Trial Court erred in awarding Wife attorney's fees; 6) whether the Trial Court erred in finding that Husband had violated the initial statutory

-16-

restraining order; and, 7) whether the Trial Court erred in requiring Husband to pay for certain portions of the transcript Wife wanted included on appeal.

Wife raises four issues on appeal, which we restate as: 1) whether the Trial Court erred in failing to establish an educational trust for the minor children; 2) whether the Trial Court erred in limiting child support to the presumptive amount of $3,200; 3) whether the Trial Court erred in imputing income to Wife of $72,000 a year for purposes of calculating child support; and, 4) whether the Trial Court erred in failing to include Husband's deferred compensation in the child support calculation. Wife also requests an award of attorney's fees on appeal, and requests that this Court take notice of a post-judicial fact.

Our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001).

We first consider whether the Trial Court erred in holding that certain of Husband's pre-marital assets had been transmuted, and that certain of Husband's pre-marital assets had been co-mingled with marital assets. Our Supreme Court discussed the concepts of marital property and separate property in *Langschmidt v. Langschmidt* and noted that in addition to the statutory provisions contained in Tenn. Code Ann. § 36-4-121(b), Tennessee intermediate appellate courts have recognized two methods by which separate property may be converted into marital property. *Langschmidt v. Langschmidt*, 81 S.W.3d 741, 747 (Tenn. 2002). These two methods are commingling and transmutation, which the Supreme Court noted have been described by this Court as follows:

> [S]eparate property becomes marital property [by commingling] if inextricably mingled with marital property or with the separate property of the other spouse. If the separate property continues to be segregated or can be traced into its product, commingling does not occur.... [Transmutation] occurs when separate property is treated in such a way as to give evidence of an intention that it become marital property.... The rationale underlying these doctrines is that dealing with property in these ways creates a rebuttable presumption of a gift to the marital estate. This presumption is based also upon the provision in many marital property statutes that property acquired during the

-17-

> marriage is presumed to be marital. The presumption can be rebutted by evidence of circumstances or communications clearly indicating an intent that the property remain separate.

*Langschmidt*, 81 S.W.3d at 747 (citations omitted).

Husband argues on appeal about two specific items that he claims should have been classified as his pre-marital property. First, Husband claims that he had accumulated approximately $214,000 in CDs and other accounts prior to the marriage and that this money should have been classified as his separate property. The evidence in the record on appeal shows that Husband put Wife's name on these accounts during the marriage. Husband asserts that he put Wife's name on the accounts because Wife pressured him to do so, but that he never intended to gift that money to Wife or to the marriage.

The Trial Court found that these pre-marital funds had been transmuted when Husband put Wife's name on the accounts. The evidence does not preponderate against this finding. Husband failed to rebut the presumption that by putting Wife's name on the accounts he was making a gift to the marital estate. We find no error in the Trial Court's classification that this property, which had been Husband's pre-marital separate property, was transmuted into marital property.

Second, Husband argues on appeal that the Trial Court erred in classifying all of the funds in Husband's deferred compensation plan as marital when Husband asserts that approximately $250,000 of those funds constituted pre-marital property. With regard to this issue, the Trial Court specifically found that: "Having withdrawn from his deferred compensation plan more money than [Husband] had in the fund when the parties married, the Court finds that there is no longer any separate money in his deferred compensation plan." The Trial Court found that during the marriage, Husband had paid alimony and child support to his previous family, had given money to his sister and his parents, and had wrongfully withdrawn $1.5 million after fraudulently claiming a hardship thereby incurring tax liability and dissipating the marital estate.

The evidence does not preponderate against these findings made by the Trial Court. We find no error in the Trial Court's holding that there no longer existed any pre-marital funds in Husband's deferred compensation account.

We next consider whether the Trial Court erred in dividing the portion of Husband's deferred compensation not accessible to Husband until certain contractual dates and conditions have been met. In its order the Trial Court held that Husband:

-18-

shall execute such documents as are necessary and required by Tennessee Valley Authority and Tennessee Valley Authority Retirement Systems and/or the Plan Administrators of any of [Husband's] retirement and deferred compensation plans to transfer to [Wife] fifty percent of the amount in the deferred compensation and that part of the pension, 401 (k) and the TVA Retirement Annuity earned and/or contributed from July 20, 2000 to the date of the divorce, together with the gains and losses, if any, to the date of distribution to [Wife].

Under the Trial Court's order, Wife will get fifty percent of the amount in Husband's deferred compensation plan which the Trial Court found to have a value as of the time of trial of $2,730,141. The evidence does not preponderate against this finding as to the value of Husband's deferred compensation plan.

It is not the role of this Court to tweak a trial court's distribution of property. Rather, we must look to determine if the overall property distribution is equitable. *King v. King*, 986 S.W.2d 216, 219 (Tenn. Ct. App. 1998). Husband, as is often the case in appeals to this Court concerning a division of marital property, wishes to focus on whether the division as to particular assets was equitable rather than whether the overall property distribution was equitable. We decline to tweak the property division as the evidence does not preponderate against this being an overall equitable marital property distribution. The evidence in the record before us does not preponderate against either the Trial Court's classification or valuation of the marital property. Likewise, the evidence does not preponderate against the Trial Court's property division being an equitable division. This issue is without merit.

Next, we consider whether the Trial Court erred in awarding transitional alimony to Wife, and in setting the amount. Trial courts have broad discretion to determine whether alimony is needed and, if so, the nature, amount, and duration of support. *Garfinkel v. Garfinkel*, 945 S.W.2d 744, 748 (Tenn. Ct. App. 1996). Pursuant to Tenn. Code Ann. § 36-5-121(i), the court is to consider the following factors in determining alimony:

(1) The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;

(2) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earnings capacity to a reasonable level;

(3) The duration of the marriage;

(4) The age and mental condition of each party;

(5) The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;

(6) The extent to which it would be undesirable for a party to seek employment outside the home, because such party will be custodian of a minor child of the marriage;

(7) The separate assets of each party, both real and personal, tangible and intangible;

(8) The provisions made with regard to the marital property, as defined in § 36-4-121;

(9) The standard of living of the parties established during the marriage;

(10) The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;

(11) The relative fault of the parties, in cases where the court, in its discretion, deems it appropriate to do so; and

(12) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

Tenn. Code Ann. § 36-5-121(i) (2005).

"There are no hard and fast rules for spousal support decisions." *Anderton v. Anderton*, 988 S.W.2d 675, 682 (Tenn. Ct. App. 1998). Decisions regarding alimony require a careful balancing of the factors in Tenn. Code Ann. § 36-5-121(i) and typically hinge on the unique facts and circumstances of the case. *Anderton*, 988 S.W.2d at 683. While all of the statutory factors are significant, the two most important factors are the obligor spouse's ability to pay and the need of the disadvantaged spouse. *Aaron v. Aaron*, 909 S.W.2d 408, 410 (Tenn. 1995).

-20-

In pertinent part, Tenn. Code Ann. § 36-5-121(g) provides:

(g)(1) Transitional alimony means a sum of money payable by one (1) party to, or on behalf of, the other party for a determinate period of time. Transitional alimony is awarded when the court finds that rehabilitation is not necessary, but the economically disadvantaged spouse needs assistance to adjust to the economic consequences of a divorce, legal separation or other proceeding where spousal support may be awarded, such as a petition for an order of protection.

Tenn. Code Ann. § 36-5-121(g)(1) (2005).

As pertinent to this issue, the Trial Court found "[Wife] needs and [Husband] can afford to pay $6,600 a month as transitional spousal support for a period of six years; reducing to $4,500 per month for three years …." We agree with the Trial Court that the evidence shows that Wife is not in need of rehabilitation. Wife is a licensed civil engineer who holds a baccalaureate degree. She has worked in the past at her chosen career. The evidence in the record on appeal further shows that Wife quit working outside the home when she gave birth to the parties' first child, and that Wife has worked as a homemaker and stay-at-home mother since that time. Thus, Wife had been out of the workforce, as of the time of trial, for seven years. The evidence does not preponderate against the Trial Court's finding that Wife is economically disadvantaged and in need of assistance to adjust to the economic consequences of divorce.

The Trial Court awarded Wife transitional alimony for nine years in this eight year marriage. Wife and Husband were married for only seven years when Wife filed for divorce.

The evidence preponderates against the Trial Court's finding that Wife needs longer to adjust to the economic consequences of the divorce than the parties were married and for longer than Wife did not work in her chosen profession. Given the facts and circumstances in this case, including Wife's professional training and the significant assets she received in the property division, the award of transitional alimony for nine years for what was only an eight year marriage is inappropriate.

Given the facts and circumstances of this case as discussed, we find that an award of transitional alimony in the amount of $6,600 a month for six years is appropriate to allow Wife to adjust to the economic consequences of the divorce. We, therefore, modify the award of transitional alimony to be in the amount of $6,600 per month lasting only six years.

-21-

We next consider whether the Trial Court erred in awarding alimony in futuro to Wife, and in calculating the amount. As pertinent to this issue, Tenn. Code Ann. § 36-5-121(f)(1) states:

(f)(1) Alimony in futuro, also known as periodic alimony, is a payment of support and maintenance on a long term basis or until death or remarriage of the recipient. Such alimony may be awarded when the court finds that there is relative economic disadvantage and that rehabilitation is not feasible, meaning that the disadvantaged spouse is unable to achieve, with reasonable effort, an earning capacity that will permit the spouse's standard of living after the divorce to be reasonably comparable to the standard of living enjoyed during the marriage, or to the post-divorce standard of living expected to be available to the other spouse, considering the relevant statutory factors and the equities between the parties.

Tenn. Code Ann. § 36-5-121(f)(1) (2005).

The Trial Court specifically found that:

H. [Wife] is a licensed civil engineer with a baccalaureate degree.

I. [Wife] speaks three languages, has no physical or mental limitations, and is capable of working.

J. [Wife's] last salary was $44,000 a year in 2001 for Alstom Power.

1. This was her first job as a civil engineer after obtaining her degree.

2. [Wife] worked for approximately 7 months, until near the birth of the parties' first child.

3. In 2001, [Wife] retained all of her earnings, $24,286.47 rather than contributing them to the family income; she used her earnings to pay her pre-marital debt for her college education with the agreement of [Husband].

K. [Wife] is capable of earning between $72,000 and $80,000 a year in the Chattanooga area.

L. There are positions paying these starting salaries in the Chattanooga area; such positions have been available for the last few years and would not be under the supervision or control of [Husband.]

M. [Wife] has refused to return to work or seek work during the pendency of this divorce. However, she is aware that there are positions available for her to work in the field in which she is trained.

The Trial Court also found that "even though Wife has the education and training as an engineer, it is unlikely that she would ever be rehabilitated to an earning capacity approaching that of [Husband]."

We respectfully disagree. The record reveals that Wife was forty-one years old at the time of trial, speaks three languages, and has no physical or mental limitations which would prevent her from working. She holds the same baccalaureate degree as does Husband and is a licensed civil engineer. Wife was able in the past to obtain a job working in her chosen field. The evidence further shows that there are job openings within Wife's chosen field in the community where Wife lives. Wife received almost $2.6 million in assets from the distribution of marital property plus one-half of Husband's TVA pension earned during the eight year marriage and received no debt.

This was a relatively short-term marriage lasting only eight years. While the Trial Court noted that the parties enjoyed "a comfortable living standard that exceeded the average …," the record also reveals that during the first five years of the eight years the parties were married, Husband's income was significantly less than it was during the final years of the marriage. It is pure speculation to say that it is unlikely that Wife could reach an earning capacity approaching that of Husband given Wife's age, education, and qualifications. Wife is younger than Husband and Wife has almost the same educational background as Husband does. Wife has no acceptable reason for not working in her chosen profession. The record is devoid of evidence showing that Wife is unable to obtain a job, or incapable of working. Another important factor relevant to the issue of Wife's need is that she received almost $2.6 million of the marital property from this marriage of only eight years.

The evidence preponderates against a finding that Wife has a need for alimony in futuro extending beyond the six years of transitional alimony. After considering all of the relevant factors, we conclude that the award of alimony in futuro was inappropriate in this case. We, therefore, vacate the award of alimony in futuro.

Next, we consider whether the Trial Court erred in calculating the award of

attorney's fees. An award of alimony in solido for payment of attorney fees likewise should be based on the factors set forth in Tenn. Code Ann. § 36-5-121(i), and is appropriate when the spouse seeking attorney fees does not have adequate funds to pay his or her legal expenses. *Yount v. Yount*, 91 S.W.3d 777, 783 (Tenn. Ct. App. 2002). Conversely, a spouse with sufficient property or income to pay his or her attorney fees is not entitled to be compensated. *Koja v. Koja*, 42 S.W.3d 94, 98 (Tenn. Ct. App. 2000).

Wife received almost $2.6 million in assets in the divorce plus one-half of Husband's TVA pension earned during the marriage and no debt. She has adequate funds to pay her own legal expenses. We note, however, that during argument before the Trial Court on the post-trial motions, Husband's attorney admitted that Husband did not object to the request for attorney's fees with regard to Husband's argument that the Islamic marriage certificate constituted a prenuptial agreement under Islamic law. Husband's attorney stated: "We failed in that. We deserve to be hit with [the attorney's fees relative to this issue], for lack of a better phrase, I hate to use the word deserve, but the bottom line is, that's how it works." Given this admission, we find that Husband shall be responsible for paying Wife's attorney's fees with regard to this particular issue.

Rather than remand for a determination of the cost of fees specific to this particular argument, which would result in the parties expending even more money on attorney's fees, we find that the $10,000 that Husband already has paid toward Wife's attorney's fees covers these fees. Wife is responsible for the remainder of her legal expenses. We, therefore, modify the Trial Court's award of attorney's fees to Wife to reflect that Husband is responsible only for the $10,000, which Husband already has paid, and that Wife is responsible for the remainder of her legal expenses.

We next consider whether the Trial Court erred in finding that Husband had violated the initial statutory restraining order. The Trial Court found that Husband made two transfers of money "after [Husband] knew or should have known that he was enjoined from withdrawing these funds from the joint CD account." The evidence does not preponderate against this finding. We note that the Trial Court did not "punish" Husband in any way for this violation. We find no error in the Trial Court's finding that Husband had violated the initial statutory restraining order.

We next consider whether the Trial Court erred in requiring Husband to pay for certain portions of the transcript Wife wanted included on appeal. After filing this appeal, Husband designated portions of the record to be included on appeal. Wife then designated additional portions of the record she wanted included on appeal. Husband filed a motion seeking an order requiring Wife to pay for the additional portions of the record which she had designated. The Trial Court held a hearing and then entered its order finding

and holding, *inter alia*, that Husband's motion seeking to have Wife pay for the disputed portions of the record was not well taken.

In *Scandlyn v. Scandlyn*, this Court stated:

The trial court has wide latitude in the steps taken to assure that a "fair, accurate and complete account of what transpired" is transmitted to the appellate court. Rule 24(b), T.R.A.P., provides that if additional parts of the record are designated by the appellee, the appellant shall "either have the additional parts prepared at his own expense or apply to the trial court for an order requiring the appellee to do so." The action upon the application is, of course, within the discretion of the trial court.

*Scandlyn v. Scandlyn*, No. 1043, 1986 Tenn. App. LEXIS 3138, at \*11 (Tenn. Ct. App. July 18, 1986), *Rule 11 appl. perm. appeal denied Nov. 3, 1986*. As this Court has explained:

Our Supreme Court discussed the abuse of discretion standard in *Eldridge v. Eldridge*, stating:

Under the abuse of discretion standard, a trial court's ruling "will be upheld so long as reasonable minds can disagree as to [the] propriety of the decision made." A trial court abuses its discretion only when it "applie[s] an incorrect legal standard, or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining." The abuse of discretion standard does not permit the appellate court to substitute its judgment for that of the trial court.

*Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001) (citations omitted).

Appellate courts ordinarily permit discretionary decisions to stand when reasonable judicial minds can differ concerning their soundness. *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 709 (Tenn. Ct. App. 1999). A trial court's discretionary decision must take into account applicable law and be consistent with the facts before the court. *Id.* When reviewing a discretionary decision by the trial court, the "appellate courts should begin with the presumption that the decision is correct and should review the evidence in the light most favorable to the decision." *Id.*

*Delapp v. Pratt*, 152 S.W.3d 530, 538 (Tenn. Ct. App. 2004).

Reasonable judicial minds, at a minimum, could disagree as to the propriety of the Trial Court's decision to order Husband to pay for the disputed portions of the transcript, the very essence of a discretionary decision. We will not substitute our judgment for that of the Trial Court. We, therefore, find no error with regard to this issue.

Turning to Wife's issues, we next consider whether the Trial Court erred in failing to establish an educational trust for the minor children. With regard to this issue, the Trial Court found and held:

a. Pursuant to § 1240-2-4-.07(g), the maximum child support obligations payable by [Husband] to [Wife] is presently $3,200 a month.

b. [Husband] has already agreed in open Court to continue to pay the children's private school tuition, books, and fees, (including the expected increases therein thru 12th grade) and their summer activity fees. These amounts, for 2007, amounted to $25,599.96, which for child support calculation purposes is converted to $2,133.33/month.

(1) The Court adopts and approves this agreement as a part of his additional child support obligation.

c. The Final Child Support Order, or FCSO, (Ex. 86, line 16) and the pro-rata monthly cost of private school and summer activities, is $5,333.33 a month[.]

d. Because the FCSO and the private school and summer activity expenses exceeds the amount of [Husband's] duty under the Adjusted Support Obligations, or ASO by over $900 a month, [Husband] shall have no other duty of financial support for his children.

e. Under the present child support laws, [Husband] is not responsible for his children's education or care beyond the 12th grade, unless said child were to become an adult disabled child. T.C.A. § 36-5-101.

f. Further, based on [Husband's] treatment of children of his first marriage, the Court does not find [Husband] to be a risk of flight or abandonment and therefore, there is no reason to require [Husband] to establish and fund an education trust for his children.

The evidence does not preponderate against these findings made by the Trial Court.

The Child Support Guidelines provide that a parent "seeking support in excess of the amount provided by the applicable percentage must prove by a preponderance of the evidence that more than this amount is reasonably necessary to provide for the needs of the child." Tenn. Comp. R. & Regs. 1240-2-4-.07(g)(1). If that parent proves the need for support in excess of the presumptive amount the court shall add an appropriate amount as a deviation and "may require that sums paid pursuant to this subparagraph be placed in an educational or other trust fund for the benefit of the child." Tenn. Comp. R. & Regs. 1240-2-4-.07(g)(2)(iii)[1].

Thus, it was within the Trial Court's discretion to order an educational trust for the benefit of the children if Wife first proved by a preponderance of the evidence that child support in an amount greater than the presumptive amount was reasonably necessary to provide for the needs of the children. Wife failed to make this showing. As such, we find no abuse of discretion by the Trial Court and thus no error in the Trial Court's refusal to order an educational trust.

We next consider whether the Trial Court erred in limiting child support to the presumptive amount. In her brief on appeal Wife argues: "If the alimony is reduced, then the child support should be increased proportionately in accordance with the guideline regulations." Wife fails to acknowledge that alimony and child support are two separate and distinct issues. Furthermore, Wife also has failed to recognize that the Trial Court did award more than the presumptive amount in child support when it first awarded the maximum amount of child support under the guidelines, and then additionally approved Husband's agreement to continue to pay private school tuition, books, fees, and summer activities, and awarded the amounts for these *in addition to* the maximum presumptive amount. In addition, we note that in support of her argument Wife relies upon the testimony of Dr. Bruce Hutchinson despite the fact that the Trial Court very clearly and specifically stated: "the Court finds the testimony of Dr. Bruce Hutchinson of no benefit in determining [Husband's] future child support obligations." We find no error in the Trial Court's award of child support.

Next, we consider whether the Trial Court erred in imputing income to Wife of $72,000 per year for the purposes of computing child support. As this Court explained in *Richardson v. Spanos*:

---

[1]In her brief on appeal Wife quotes from the Child Support Guidelines in effect in the early 1990s and cites to case law from that same time period applying that specific section. The Child Support Guidelines have changed significantly since that time. We quote from and apply, as did the Trial Court, the Child Support Guidelines applicable at the time of the divorce in the instant case.

Prior to the adoption of the Child Support Guidelines, trial courts had wide discretion in matters relating to child custody and support. *Hopkins v. Hopkins*, 152 S.W.3d 447, 452 (Tenn. 2004) (Barker, J., dissenting). Their discretion was guided only by broad equitable principles and rules which took into consideration the condition and means of each parent. *Brooks v. Brooks*, 166 Tenn. 255, 257, 61 S.W.2d 654, 654 (1933). However, the adoption of the Child Support Guidelines has limited the court's discretion substantially, and decisions regarding child support must be made within the strictures of the Child Support Guidelines. *Berryhill v. Rhodes*, 21 S.W.3d 188, 193 (Tenn. 2000); *Jones v. Jones*, 930 S.W.2d 541, 545 (Tenn. 1996); *Smith v. Smith*, 165 S.W.3d 279, 282 (Tenn. Ct. App. 2004).

* * *

Because child support decisions retain an element of discretion, we review them using the deferential "abuse of discretion" standard. This standard is a review-constraining standard of review that calls for less intense appellate review and, therefore, less likelihood that the trial court's decision will be reversed. *State ex rel Jones v. Looper*, 86 S.W.3d 189, 193 (Tenn. Ct. App. 2000); *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 222-23 (Tenn. Ct. App. 1999). Appellate courts do not have the latitude to substitute their discretion for that of the trial court. *Henry v. Goins*, 104 S.W.3d 475, 479 (Tenn. 2003); *State ex rel. Vaughn v. Kaatrude*, 21 S.W.3d 244, 248 (Tenn. Ct. App. 2000). Thus, a trial court's discretionary decision will be upheld as long as it is not clearly unreasonable, *Bogan v. Bogan*, 60 S.W.3d 721, 733 (Tenn. 2001), and reasonable minds can disagree about its correctness. *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001); *State v. Scott*, 33 S.W.3d 746, 752 (Tenn. 2000). Discretionary decisions must, however, take the applicable law and the relevant facts into account. *Ballard v. Herzke*, 924 S.W.2d 652, 661 (Tenn. 1996). Accordingly, a trial court will be found to have "abused its discretion" when it applies an incorrect legal standard, reaches a decision that is illogical, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party. *Perry v. Perry*, 114 S.W.3d 465, 467 (Tenn. 2003); *Clinard v. Blackwood*, 46 S.W.3d 177, 182 (Tenn. 2001); *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 709 (Tenn. Ct. App. 1999).

*Richardson v. Spanos*, 189 S.W.3d 720, 725 (Tenn. Ct. App. 2005).

The Child Support Guidelines provide that imputing income to a parent when

calculating child support is appropriate: "If a parent has been determined by a tribunal to be willfully and/or voluntarily underemployed or unemployed …." Tenn. Comp. R. & Regs. 1240-2-4-.04(3)(a)(2)(i)(I). When making a determination of willful or voluntary unemployment or underemployment, a trial court may consider:

(I) The parent's past and present employment;

(II) The parent's education, training, and ability to work;

(III) The State of Tennessee recognizes the role of a stay-at-home parent as an important and valuable factor in a child's life. In considering whether there should be any imputation of income to a stay-at-home parent, the tribunal shall consider:

> I. Whether the parent acted in the role of full-time caretaker while the parents were living in the same household;

> II. The length of time the parent staying at home has remained out of the workforce for this purpose; and

> III. The age of the minor children.

Tenn. Comp. R. & Regs. 1240-2-4-.04(3)(a)(2)(iii).

The Trial Court clearly considered all of the relevant factors and determined that it was proper to impute income to Wife for purposes of calculating child support. The evidence in the record on appeal does not preponderate against this finding.

Wife also argues that the Trial Court erred in imputing the amount of $72,000. The record reveals that Husband testified that there are companies in the community where Wife lives paying people with Wife's experience and level of education between $70,000 and $80,000. The record on appeal is devoid of evidence to the contrary.

Wife argues that this Court should not accept Husband's testimony with regard to this issue as the Trial Court found Husband to be not credible. Wife is mistaken. The Trial Court found Wife to be more credible with regard to other issues, but clearly found Husband to be credible with regard to this issue. The Trial Court specifically found that "[Wife] is capable of earning between $72,000 and $80,000 a year in the Chattanooga area" and that "[t]here are positions paying these starting salaries in the Chattanooga area; such positions have been available for the last few years and would not be under the supervision

-29-

or control of [Husband]."

The evidence in the record on appeal does not preponderate against these findings. Given this, we find no error in the Trial Court's imputing income to Wife of $72,000 per year for the purposes of computing child support.

We next consider whether the Trial Court erred in not including money from the deferred compensation plan in Husband's income for purposes of calculating child support. To begin, we again note that Wife's argument relies upon the testimony of Dr. Bruce Hutchinson, which the Trial Court clearly and specifically found to be "of no benefit in determining [Husband's] future child support obligations." In addition, the Trial Court awarded the maximum presumptive amount, and Wife failed to prove by a preponderance of the evidence that more than this amount was reasonably necessary to provide for the needs of the children, as discussed fully above. As such, even if the Trial Court erred in not considering the funds in the deferred compensation plan when calculating child support, and we make no finding regarding whether this was or was not error, any such alleged error was harmless. This issue is without merit.

Wife requests this Court to take notice of the post-judicial fact that Regions Bank paid Wife $885,860, and paid Husband the remainder of funds in the account, $217,621.43. In its findings of fact and conclusions of law contained in its April 16, 2009 order, the Trial Court valued the Regions Bank CD at $1,050,000. However, in Exhibit 1, incorporated into the Trial Court's order by reference, the Trial Court valued the Regions Bank CD at $1,085,000. Exhibit 2, incorporated into the order by reference, shows that the Trial Court distributed the Regions Bank CD by awarding $885,860 to Wife and $229,450 to Husband. When added together, the award of $885,860 to Wife and the award of $229,450 to Husband total $1,115,310.

Clearly, the amount of money in the Regions Bank CD both at the time the Trial Court valued it and at the time of distribution was different from the values stated in the Trial Court's order. The end result as to that asset is that while Wife received the full $885,860 specifically awarded to her, Husband received less than the $229,450 awarded to him. We are puzzled as to why Wife, rather than Husband, requests we take notice of this fact, and Wife has not shown how this fact would be relevant to the issues raised on appeal. In the exercise of our discretion we deny Wife's motion.

Finally, each party has more than sufficient assets to pay his or her own attorney. In the exercise of our discretion, we decline to award attorney's fees on appeal to either party.

## **Conclusion**

The portion of the judgment of the Trial Court awarding alimony in futuro is vacated. The portion of the judgment awarding transitional alimony and attorney's fees is modified such that Husband shall pay Wife $6,600 per month as transitional alimony for six years, and Husband shall be responsible only for the $10,000 in Wife's attorney's fees which Husband already has paid. The remainder of the Trial Court's judgment is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed one-half against the appellant, Masoud Bajestani, and his surety, and one-half against the appellee, Maryam Ghorashi-Bajastani.

_____
D. MICHAEL SWINEY, JUDGE